# TITLE VI--MILLENNIUM CHALLENGE ACT OF 2003

GOVERNMENT
EXHIBIT
A
CARDELLS 800-783-0359

## SEC. 601. SHORT TITLE.

This title may be cited as the ``Millennium Challenge Act of 2003''.

## SEC. 602. PURPOSES.

The purposes of this title are--

(1) to provide United States assistance for global development through the Millennium Challenge Corporation, as described in section 604; and

(2) to provide such assistance in a manner that promotes economic growth and the elimination of extreme poverty and strengthens good governance, economic freedom, and investments in people.

## SEC. 603. DEFINITIONS.

In this title:

(1) **APPROPRIATE CONGRESSIONAL COMMITTEES**.--The term ``appropriate congressional committees'' means--

(A) the Committee on International Relations and the Committee on Appropriations of the House of Representatives; and

(B) the Committee on Foreign Relations and the Committee on Appropriations of the Senate.

(2) **BOARD**.--The term ``Board'' means the Board of Directors of the Corporation established pursuant to section 604(c).

(3) **CANDIDATE COUNTRY**.--The term ``candidate country'' means a country that meets the requirements of section 606.

(4) **CHIEF EXECUTIVE OFFICER**.--The term ``Chief Executive Officer'' means the chief executive officer of the Corporation appointed pursuant to section 604(b).

(5) **COMPACT**.--The term ``Compact'' means a Millennium Challenge Compact described in section 609.

(6) **CORPORATION**.--The term ``Corporation'' means the Millennium Challenge Corporation established by section 604(a).

(7) **ELIGIBLE COUNTRY**.--The term ``eligible country'' means a candidate country that is determined, under section 607, to be an eligible country to receive assistance under section 605.

## SEC. 604. ESTABLISHMENT AND MANAGEMENT OF THE MILLENNIUM CHALLENGE CORPORATION.

(a) **ESTABLISHMENT**.--There is established in the executive branch a corporation to be known as the ``Millennium Challenge Corporation'' that shall be responsible for carrying out this title. The Corporation shall be a government corporation, as defined in section 103 of title 5, United States Code.

(b) **CHIEF EXECUTIVE OFFICER**.--

(1) **IN GENERAL**.--There shall be in the Corporation a Chief Executive Officer who shall be responsible for the management of the Corporation.

(2) **APPOINTMENT**.--

(A) **IN GENERAL**.--Except as provided in subparagraph (B), the Chief Executive Officer shall be appointed by the President, by and with the advice and consent of the Senate.

(B) **INTERIM CEO**.--The members of the Board of Directors described in subsection (c)(3)(A) may designate by unanimous consent in writing an individual who is an officer within any Federal department or agency (and who has been appointed to such position by the President, by and with the advice and consent of the Senate) to carry out the duties described in this subsection until the Chief Executive Officer is appointed pursuant to subparagraph (A).

(3) **RELATIONSHIP TO BOARD**.--The Chief Executive Officer shall report to and be under the direct authority of the Board.

(4) **COMPENSATION AND RANK**.--

(A) **IN GENERAL**.--The Chief Executive Officer shall be compensated at the rate provided for level II of the Executive Schedule under section 5313 of title 5, United States Code, and shall have the equivalent rank of Deputy Secretary.

(B) **AMENDMENT**.--Section 5313 of title 5, United States Code, is amended by adding at the end the following:

`` Chief Executive Officer, Millennium Challenge Corporation.''.

(5) **AUTHORITIES AND DUTIES**.--The Chief Executive Officer shall be responsible for the management of the Corporation and shall exercise the powers and discharge the duties of the Corporation.

(6) **AUTHORITY TO APPOINT OFFICERS**.--In consultation and with approval of the Board, the Chief Executive Officer shall appoint all officers of the Corporation.

(c) **BOARD OF DIRECTORS**.--

(1) **ESTABLISHMENT**.--There shall be in the Corporation a Board of Directors.

(2) **DUTIES**.--The Board shall perform the functions specified to be carried out by the

Board in this title and may prescribe, amend, and repeal bylaws, rules, regulations, and procedures governing the manner in which the business of the Corporation may be conducted and in which the powers granted to it by law may be exercised.

(3) **MEMBERSHIP**.--The Board shall consist of--

(A) the Secretary of State, the Secretary of the Treasury, the Administrator of the United States Agency for International Development, the Chief Executive Officer of the Corporation, and the United States Trade Representative; and

(B) four other individuals with relevant international experience who shall be appointed by the President, by and with the advice and consent of the Senate, of which--

(i) one individual should be appointed from among a list of individuals submitted by the majority leader of the House of Representatives;

(ii) one individual should be appointed from among a list of individuals submitted by the minority leader of the House of Representatives;

(iii) one individual should be appointed from among a list of individuals submitted by the majority leader of the Senate; and

(iv) one individual should be appointed from among a list of individuals submitted by the minority leader of the Senate.

(4) **TERMS**.--

(A) **OFFICERS OF THE FEDERAL GOVERNMENT**.--Each member of the Board described in paragraph (3)(A) shall serve for a term that is concurrent with the term of service of the individual's position as an officer within the other Federal department or agency.

(B) **OTHER MEMBERS**.--Each member of the Board described in paragraph (3)(B) shall be appointed for a term of 3 years and may be reappointed for a term of an additional 2 years.

(C) **VACANCIES**.--A vacancy in the Board shall be filled in the manner in which the original appointment was made.

(5) **CHAIRPERSON**.--There shall be a Chairperson of the Board. The Secretary of State shall serve as the Chairperson.

(6) **QUORUM**.--A majority of the members of the Board shall constitute a quorum, which, except with respect to a meeting of the Board during the 135-day period beginning on the date of the enactment of this Act, shall include at least one member of the Board described in paragraph (3)(B).

(7) **MEETINGS**.--The Board shall meet at the call of the Chairperson.

(8) **COMPENSATION**.--

(A) **OFFICERS OF THE FEDERAL GOVERNMENT**.--

(i) **IN GENERAL**.--A member of the Board described in paragraph (3)(A) may not receive additional pay, allowances, or benefits by reason of the member's service on the Board.

(ii) **TRAVEL EXPENSES**.--Each such member of the Board shall receive travel expenses, including per diem in lieu of subsistence, in accordance with applicable provisions under subchapter I of chapter 57 of title 5, United States Code.

(B) **OTHER MEMBERS**.--

(i) **IN GENERAL**.--Except as provided in clause (ii), a member of the Board described in paragraph (3)(B)--

(I) shall be paid compensation out of funds made available for the purposes of this title at the daily equivalent of the highest rate payable under section 5332 of title 5, United States Code, for each day (including travel time) during which the member is engaged in the actual performance of duties as a member of the Board; and

(II) while away from the member's home or regular place of business on necessary travel in the actual performance of duties as a member of the Board, shall be paid per diem, travel, and transportation expenses in the same manner as is provided under subchapter I of chapter 57 of title 5, United States Code.

(ii) **LIMITATION**.--A member of the Board may not be paid compensation under clause (i)(II) for more than 90 days in any calendar year.

## SEC. 605. AUTHORIZATION OF ASSISTANCE.

(a) **ASSISTANCE**.--Notwithstanding any other provision of law (other than a provision of this title), the Board, acting through the Chief Executive Officer, is authorized to provide assistance under this section for each country that enters into a Millennium Challenge Compact with the United States pursuant to section 609 to support policies and programs that advance the progress of the country in achieving lasting economic growth and poverty reduction and are in furtherance of the purposes of this title.

(b) **FORM OF ASSISTANCE**.--Assistance under this section may be provided in the form of grants, cooperative agreements, or contracts to or with eligible entities described in subsection (c). Assistance under this section may not be provided in the form of loans.

(c) **ELIGIBLE ENTITIES**.--An eligible entity referred to in subsection (b) is --

(1) the national government of the eligible country;

(2) regional or local governmental units of the country; or

(3) a nongovernmental organization or a private entity.

(d) **APPLICATION**.--The Chief Executive Officer, in consultation with the Board and working with eligible countries selected by the Board for negotiation of Compacts, should develop and recommend procedures for considering solicited and unsolicited proposals in Compacts prior to an approval of the Compacts by the Board.

(e) **LIMITATIONS**.--

(1) **PROHIBITION ON MILITARY ASSISTANCE AND TRAINING**.--Assistance under this section may not include military assistance or military training for a country.

(2) **PROHIBITION ON ASSISTANCE RELATING TO UNITED STATES JOB LOSS OR PRODUCTION DISPLACEMENT**.--Assistance under this section may not be provided for any project that is likely to cause a substantial loss of United States jobs or a substantial displacement of United States production.

(3) **PROHIBITION ON ASSISTANCE RELATING TO ENVIRONMENTAL, HEALTH, OR SAFETY HAZARDS**.--Assistance under this section may not be provided for any project that is likely to cause a significant environmental, health, or safety hazard.

(4) **PROHIBITION ON US E OF FUNDS FOR ABORTIONS AND INVOLUNTARY STERILIZATIONS**.--The prohibitions on use of funds contained in paragraphs (1) through (3) of section 104(f) of the Foreign Assistance Act of 1961 (22 U.S.C. 2151b(f)(1)-(3)) shall apply to funds made available to carry out this section to the same extent and in the same manner as such prohibitions apply to funds made available to carry out part I of such Act. The prohibition on use of funds contained in any provision of law comparable to the eleventh and fourteenth provisos under the heading ``Child Survival and Health Programs Fund'' of division E of Public Law 108-7 (117 Stat. 162) shall apply to funds made available to carry out this section for fiscal year 2004.

(f) **COORDINATION**.--The provision of assistance under this section shall be coordinated with other United States foreign assistance programs.

## SEC. 606. CANDIDATE COUNTRIES.

(a) **LOW INCOME COUNTRIES** .--

(1) **FISCAL YEAR 2004**.--A country shall be a candidate country for purposes of eligibility for assistance for fiscal year 2004 if--

(A) the country is eligible for assistance from the International Development Association, and the per capita income of the country is equal to or less than the historical ceiling of the International Development Association for that year, as defined by the International Bank for Reconstruction and Development; and

(B) subject to paragraph (3), the country is not ineligible to receive United States economic assistance under part I of the Foreign Assistance Act of 1961 by reason of the application of any provision of the Foreign Assistance Act of 1961 or any other provision of law.

(2) **FISCAL YEAR 2005 AND SUBSEQUENT FISCAL YEARS**.--A country shall be a candidate country for purposes of eligibility for assistance for fiscal year 2005 or a subsequent fiscal year if--

(A) the per capita income of the country is equal to or less than the historical ceiling of the International Development Association for the fiscal year involved, as defined by the International Bank for Reconstruction and Development; and

(B) the country meets the requirements of paragraph (1)(B).

(3) **RULE OF CONSTRUCTION**.--For the purposes of determining whether a country is eligible for receiving assistance under section 605 pursuant to paragraph (1)(B), the exercise by the President, the Secretary of State, or any other officer or employee of the United States of any waiver or suspension of any provision of law referred to in such paragraph, and notification to the appropriate congressional committees in accordance with such provision of law, shall be construed as satisfying the requirement of such paragraph.

(b) **LOWER MIDDLE INCOME COUNTRIES**.--

(1) **IN GENERAL**.--In addition to countries described in subsection (a), a country shall be a candidate country for purposes of eligibility for assistance for fiscal year 2006 or a subsequent fiscal year if the country--

(A) is classified as a lower middle income country in the then most recent edition of the World Development Report for Reconstruction and Development published by the International Bank for Reconstruction and Development and has an income greater than the historical ceiling for International Development Association eligibility for the fiscal year involved; and

(B) meets the requirements of subsection (a)(1)(B).

(2) **LIMITATION**.--The total amount of assistance provided to countries described in paragraph (1) for fiscal year 2006 or any subsequent fiscal year may not exceed 25 percent of the total amount of assistance provided to all countries under section 605 for fiscal year 2006 or the subsequent fiscal year, as the case may be.

(c) **IDENTIFICATION BY THE BOARD**.--The Board shall identify whether a country is a candidate country for purposes of this section.

## SEC. 607. ELIGIBLE COUNTRIES.

(a) **DETERMINATION BY THE BOARD**.--The Board shall determine whether a candidate country is an eligible country for purposes of this section. Such determination shall be based, to the maximum extent possible, upon objective and quantifiable indicators of a country's demonstrated commitment to the criteria in subsection (b), and shall, where appropriate, take into account and assess the role of women and girls.

(b) **CRITERIA**.--A candidate country should be considered to be an eligible country for purposes of this section if the Board determines that the country has demonstrated a commitment to--

(1) just and democratic governance, including a demonstrated commitment to--

(A) promote political pluralism, equality, and the rule of law;

(B) respect human and civil rights, including the rights of people with disabilities;

(C) protect private property rights;

(D) encourage transparency and accountability of government; and

(E) combat corruption;

(2) economic freedom, including a demonstrated commitment to economic policies that--

(A) encourage citizens and firms to participate in global trade and international capital markets;

(B) promote private sector growth and the sustainable management of natural resources;

(C) strengthen market forces in the economy; and

(D) respect worker rights, including the right to form labor unions; and

(3) investments in the people of such country, particularly women and children, including programs that--

(A) promote broad-based primary education; and

(B) strengthen and build capacity to provide quality public health and reduce child mortality.

(c) **SELECTION BY THE BOARD**.--

(1) **IN GENERAL**.--At the time the Board determines eligible countries under this section for a fiscal year, the Board shall select those eligible countries with respect to which the United States will initially seek to enter into a Millennium Challenge Compact pursuant to section 609.

(2) **FACTORS**.--In selecting eligible countries under paragraph (1), the Board shall consider the following factors:

(A) The extent to which the country clearly meets or exceeds the eligibility criteria.

(B) The opportunity to reduce poverty and generate economic growth in the country.

(C) The availability of amounts to carry out this title.

(d) **ESTABLISHMENT OF CRITERIA AND METHODOLOGY**.--The criteria and methodology submitted by the Board to Congress and published in the Federal Register under section 608(b)(2) with respect to a fiscal year shall remain fixed for purposes of eligibility determinations for such year.

(e) **ANNUAL MODIFICATION OF CRITERIA AND METHODOLOGY**.--As appropriate, the Board, acting through the Chief Executive Officer, shall review the eligibility criteria and methodology and modify such criteria and methodology in subsequent years consistent with section 608(b).

## SEC. 608. CONGRESSIONAL AND PUBLIC NOTIFICATION OF CANDIDATE COUNTRIES, ELIGIBILITY CRITERIA, AND ELIGIBLE COUNTRIES.

(a) **IDENTIFICATION OF CANDIDATE COUNTRIES**.--Not later than 90 days prior to the date on which the Board determines eligible countries under section 607 for a fiscal year, the Chief Executive Officer--

(1) shall prepare and submit to the appropriate congressional committees a report that contains a list of all candidate countries identified under section 606, and all countries that would be candidate countries if the countries met the requirement contained in section 606(a)(1)(B), for the fiscal year; and

(2) shall publish in the Federal Register the information contained in the report described in paragraph (1).

(b) **IDENTIFICATION OF ELIGIBILITY CRITERIA AND METHODOLOGY**.--Not later than 60 days prior to the date on which the Board determines eligible countries under section 607 for a fiscal year, the Chief Executive Officer--

(1) shall prepare and submit to the appropriate congressional committees a report that contains a list of the criteria and methodology described in subsections (a) and (b) of section 607 that will be used to determine eligibility for each candidate country identified under subsection (a);

(2) shall publish in the Federal Register the information contained in the report described in paragraph (1); and

(3) may conduct one or more public hearings on the eligibility criteria and methodology.

(c) **PUBLIC COMMENT AND CONGRESSIONAL CONSULTATION**.--

(1) **PUBLIC COMMENT**.--The Chief Executive Officer shall, for the 30-day period beginning on the date of publication in the Federal Register of the information contained in the report described in subsection (b)(1), accept public comment and consider such comment for purposes of determining eligible countries under section 607.

(2) **CONGRESSIONAL CONSULTATION**.--The Chief Executive Officer shall consult with the appropriate congressional committees on the extent to which the candidate countries meet the criteria described in section 607(b).

(d) **IDENTIFICATION OF ELIGIBLE COUNTRIES** .--Not later than 5 days after the date on which the Board determines eligible countries under section 607 for a fiscal year, the Chief Executive Officer--

(1) shall prepare and submit to the appropriate congressional committees a report that contains a list of all such eligible countries, an identification of those countries on such list with respect to which the Board will seek to enter into a Compact under section 609, and a justification for such eligibility determination and selection for Compact negotiation; and

(2) shall publish in the Federal Register the information contained in the report described in paragraph (1).

## SEC. 609. MILLENNIUM CHALLENGE COMPACT.

(a) **COMPACT**.--The Board, acting through the Chief Executive Officer of the Corporation, may provide assistance for an eligible country only if the country enters into an agreement with the United States, to be known as a ``Millennium Challenge Compact'', that establishes a multi-year plan for achieving shared development objectives in furtherance of the purposes of this title.

(b) **ELEMENTS** .--

(1) **IN GENERAL**.--The Compact should take into account the national development strategy of the eligible country and shall contain--

(A) the specific objectives that the country and the United States expect to achieve during the term of the Compact;

(B) the responsibilities of the country and the United States in the achievement of such objectives;

(C) regular benchmarks to measure, where appropriate, progress toward achieving such objectives;

(D) an identification of the intended beneficiaries, disaggregated by income level, gender, and age, to the maximum extent practicable;

(E) a multi-year financial plan, including the estimated amount of contributions by the Corporation and the country and proposed mechanisms to implement the plan and provide oversight, that describes how the requirements of subparagraphs (A) through (D) will be met, including identifying the role of civil society in the achievement of such requirements;

(F) where appropriate, a description of the current and potential participation of other donors in the achievement of such objectives;

(G) a plan to ensure appropriate fiscal accountability for the use of assistance provided under section 605;

(H) where appropriate, a process or processes for consideration of solicited proposals under the Compact as well as a process for consideration of unsolicited proposals by the Corporation and national, regional, or local units of government;

(I) a requirement that open, fair, and competitive procedures are used in a transparent manner in the administration of grants or cooperative agreements or the procurement of goods and services for the accomplishment of objectives under the Compact;

(J) the strategy of the eligible country to sustain progress made toward achieving such objectives after expiration of the Compact; and

(K) a description of the role of the United States Agency for International Development in any design, implementation, and monitoring of programs and activities funded under the Compact.

(2) **LOWER MIDDLE INCOME COUNTRIES**.--In addition to the elements described in subparagraphs (A) through (K) of paragraph (1), with respect to a lower middle income country described in section 606(b), the Compact shall identify a contribution, as appropriate, from the country relative to its national budget, taking into account the prevailing economic conditions, toward meeting the objectives of the Compact. Any such contribution should be in addition to government spending allocated for such purposes in the country's budget for the year immediately preceding the establishment of the Compact and should continue for the duration of the Compact.

(3) **DEFINITION**.--In this subsection, the term ``national development strategy'' means any strategy to achieve market-driven economic growth and eliminate extreme poverty that has been developed by the government of the country in consultation with a wide variety of civic participation, including nongovernmental organizations, private and voluntary organizations, academia, women's and student organizations, local trade and labor unions, and the business community.

(c) **ADDITIONAL PROVISION RELATING TO PROHIBITION ON TAXATION**.--In addition to the elements described in subsection (c), each Compact shall contain a provision that states that assistance provided by the United States under the Compact shall be exempt from taxation by the government of the eligible country.

(d) **LOCAL INPUT**.--In entering into a Compact, the United States shall seek to ensure that the government of an eligible country--

(1) takes into account the local-level perspectives of the rural and urban poor, including women, in the eligible country; and

(2) consults with private and voluntary organizations, the business community, and other donors in the eligible country.

(e) **CONSULTATION**.--During any discussions with a country for the purpose of entering into a Compact with the country, officials of the Corporation participating in such discussions shall, at a minimum, consult with appropriate officials of the United States Agency for International Development, particularly with those officials responsible for the appropriate region or country on development issues related to the Compact.

(f) **COORDINATION WITH OTHER DONORS**.--To the maximum extent feasible, activities undertaken to achieve the objectives of the Compact shall be undertaken in coordination with the assistance activities of other donors.

(g) **ASSISTANCE FOR DEVELOPMENT OF COMPACT**.--Notwithstanding subsection (a), the Chief Executive Officer may enter into contracts or make grants for any eligible country for the purpose of facilitating the development and implementation of the Compact between the United States and the country.

(h) **REQUIREMENT FOR APPROVAL BY THE BOARD**.--Each Compact shall be approved by the Board before the United States enters into the Compact.

(i) **INCREASE OR EXTENSION OF ASSISTANCE UNDER A COMPACT**.--Not later than 15 days after making a determination to increase or extend assistance under a Compact with an eligible country, the Board, acting through the Chief Executive Officer--

(1) shall prepare and transmit to the appropriate congressional committees a written report and justification that contains a detailed summary of the proposed increase in or extension of assistance under the Compact and a copy of the full text of the amendment to the Compact; and

(2) shall publish a detailed summary, full text, and justification of the proposed increase in or extension of assistance under the Compact in the Federal Register and on the Internet website of the Corporation.

(j) **DURATION OF COMPACT**.--The duration of a Compact shall not exceed 5 years.

(k) **SUBSEQUENT COMPACTS**.--An eligible country and the United States may enter into and have in effect only one Compact at any given time under this section. An eligible country and the United States may enter into one or more subsequent Compacts in accordance with the requirements of this title after the expiration of the existing Compact.

## SEC. 610. CONGRESSIONAL AND PUBLIC NOTIFICATION OF COMPACT.

(a) **CONGRESSIONAL CONSULTATION PRIOR TO COMPACT NEGOTIATIONS**.--Not later than 15 days prior to the start of negotiations of a Compact with an eligible country, the Board, acting through the Chief Executive Officer--

(1) shall consult with the appropriate congressional committees with respect to the proposed Compact negotiation; and

(2) shall identify the objectives and mechanisms to be used for the negotiation of the Compact.

(b) **CONGRESSIONAL AND PUBLIC NOTIFICATION AFTER ENTERING INTO A COMPACT**.--Not later than 10 days after entering into a Compact with an eligible country, the Board, acting through the Chief Executive Officer--

(1) shall provide notification of the Compact to the appropriate congressional committees, including a detailed summary of the Compact and a copy of the text of the Compact; and

(2) shall publish such detailed summary and the text of the Compact in the Federal Register and on the Internet website of the Corporation.

## SEC. 611. SUSPENSION AND TERMINATION OF ASSISTANCE.

(a) **SUSPENSION AND TERMINATION OF ASSISTANCE**.--After consultation with the Board, the Chief Executive Officer may suspend or terminate assistance in whole or in part for a country or entity under section 605 if the Chief Executive Officer determines that-

(1) the country or entity is engaged in activities which are contrary to the national security interests of the United States;

(2) the country or entity has engaged in a pattern of actions inconsistent with the criteria used to determine the eligibility of the country or entity, as the case may be; or

(3) the country or entity has failed to adhere to its responsibilities under the Compact.

(b) **REINSTATEMENT**.--The Chief Executive Officer may reinstate assistance for a country or entity under section 605 only if the Chief Executive Officer determines that the country or entity has demonstrated a commitment to correcting each condition for which assistance was suspended or terminated under subsection (a).

(c) **CONGRESSIONAL NOTIFICATION**.--Not later than 3 days after the date on which the Chief Executive Officer suspends or terminates assistance under subsection (a) for a country or entity, or reinstates assistance under subsection (b) for a country or entity, the Chief Executive Officer shall submit to the appropriate congressional committees a report that contains the determination of the Chief Executive Officer under subsection (a) or subsection (b), as the case may be.

(d) **RULE OF CONSTRUCTION**.--The authority to suspend or terminate assistance under this section includes the authority to suspend or terminate obligations and sub-obligations.

## SEC. 612. DISCLOSURE.

(a) **REQUIREMENT FOR DISCLOSURE**.--The Corporation shall make available to the public on at least a quarterly basis, the following information:

(1) For assistance provided under section 605--

(A) the name of each entity to which assistance is provided;

(B) the amount of assistance provided to the entity; and

(C) a description of the program or project, including--

(i) a description of whether the program or project was solicited or unsolicited; and

(ii) a detailed description of the objectives and measures for results of the program or project.

(2) For funds allocated or transferred under section 619(b)--

(A) the name of each United States Government agency to which such funds are transferred or allocated;

(B) the amount of funds transferred or allocated to such agency; and

(C) a description of the program or project to be carried out by such agency with such funds.

(b) **DISSEMINATION**.--The information required to be disclosed under subsection (a) shall be made available to the public by means of publication in the Federal Register and on the Internet website of the Corporation, as well as by any other methods that the Board determines appropriate.

## SEC. 613. ANNUAL REPORT.

(a) **REPORT**.--Not later than March 31, 2005, and each March 31 thereafter, the President shall submit to Congress a report on the assistance provided under section 605 during the prior fiscal year.

(b) **CONTENTS**.--The report shall include the following:

(1) The amount of obligations and expenditures for assistance provided to each eligible country during the prior fiscal year.

(2) For each eligible country, an assessment of--

(A) the progress made during each year by the country toward achieving the objectives set out in the Compact entered into by the country; and

(B) the extent to which assistance provided under section 605 has been effective in helping the country to achieve such objectives.

(3) A description of the coordination of assistance provided under section 605 with other United States foreign assistance and related trade policies.

(4) A description of the coordination of assistance provided under section 605 with assistance provided by other donor countries.

(5) Any other information the President considers relevant with respect to assistance provided under section 605.

## SEC. 614. POWERS OF THE CORPORATION; RELATED PROVISIONS.

(a) **POWERS**.--The Corporation--

(1) shall have perpetual succession unless dissolved by a law enacted after the date of the enactment of this Act;

(2) may adopt, alter, and use a seal, which shall be judicially noticed;

(3) may make and perform such contracts, grants, and other agreements with any person or government however designated and wherever situated, as may be necessary for carrying out the functions of the Corporation;

(4) may determine and prescribe the manner in which its obligations shall be incurred and its expenses allowed and paid, including expenses for representation;

(5) may lease, purchase, or otherwise acquire, improve, and use such real property wherever situated, as may be necessary for carrying out the functions of the Corporation;

(6) may accept cash gifts or donations of services or of property (real, personal, or mixed), tangible or intangible, for the purpose of carrying out the provisions of this title;

(7) may use the United States mails in the same manner and on the same conditions as the Executive departments;

(8) may contract with individuals for personal services, who shall not be considered Federal employees for any provision of law administered by the Office of Personnel Management;

(9) may hire or obtain passenger motor vehicles; and

(10) shall have such other powers as may be necessary and incident to carrying out this title.

(b) **PRINCIPAL OFFICE**.--The Corporation shall maintain its principal office in the metropolitan area of Washington, District of Columbia.

(c) **POSITIONS WITH FOREIGN GOVERNMENTS**.--When approved by the Chief Executive Officer, for purposes of implementing a Compact, employees of the Corporation (including individuals detailed to the Corporation) may accept and hold offices or positions to which no compensation is attached with governments or governmental agencies of foreign countries or with international organizations.

(d) **OTHER AUTHORITIES**.--Except to the extent inconsistent with the provisions of this title, the administrative authorities contained in the State Department Basic Authorities Act of 1956 (22 U.S.C. 2651a et seq.) and the Foreign Assistance Act of 1961 (22 U.S.C. 2151 et seq.) shall apply to the implementation of this title to the same extent and in the same manner as such authorities apply to the implementation of those Acts.

(e) **APPLICABILITY OF GOVERNMENT CORPORATION CONTROL ACT**.--

(1) **IN GENERAL**.--The Corporation shall be subject to chapter 91 of subtitle VI of title 31, United States Code, except that the Corporation shall not be authorized to issue obligations or offer obligations to the public.

(2) **CONFORMING AMENDMENT**.--Section 9101(3) of title 31, United States Code, is amended by adding at the end the following:

``(Q) the Millennium Challenge Corporation.''.

(f) **INSPECTOR GENERAL**.--

(1) **IN GENERAL**.--The Inspector General of the United States Agency for International Development shall serve as Inspector General of the Corporation, and, in acting in such capacity, may conduct reviews, investigations, and inspections of all aspects of the operations and activities of the Corporation.

(2) **AUTHORITY OF THE BOARD**.--In carrying out the responsibilities under this subsection, the Inspector General shall report to and be under the general supervision of the Board.

(3) **REIMBURSEMENT AND AUTHORIZATION OF SERVICES**.--

(A) **REIMBURSEMENT**.--The Corporation shall reimburse the United States Agency for International Development for all expenses incurred by the Inspector General in connection with the Inspector General's responsibilities under this subsection.

(B) **AUTHORIZATION FOR SERVICES**.--Of the amount authorized to be appropriated under section 619(a) for a fiscal year, up to $5,000,000 is authorized to be made available to the Inspector General of the United States Agency for International Development to conduct reviews, investigations, and inspections of operations and activities of the Corporation.

(g) **SPECIAL ASSISTANCE**.--

(1) **IN GENERAL**.--The Chief Executive Officer is authorized to contract with any nongovernmental organization (including a university, independent foundation, or other organization) in the United States or in a candidate country, and, where appropriate, directly with a governmental agency of any such country, that is undertaking research aimed at improving data related to eligibility criteria under this title with respect to the country.

(2) **FUNDING**.--Of the amount authorized to be appropriated under section 619(a) for a fiscal year, up to $5,000,000 is authorized to be made available to carry out paragraph (1).

## SEC. 615. COORDINATION WITH UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT.

(a) **REQUIREMENT FOR COORDINATION**.--The Chief Executive Officer shall consult with the Administrator of the United States Agency for International Development in order to coordinate the activities of the Corporation with the activities of the Agency.

(b) **USAID PROGRAMS**.--The Administrator of the United States Agency for International Development shall seek to ensure that appropriate programs of the Agency play a primary role in preparing candidate countries to become eligible countries.

### SEC. 616. ASSISTANCE TO CERTAIN CANDIDATE COUNTRIES.

(a) **AUTHORIZATION**.--The Board, acting through the Chief Executive Officer, is authorized to provide assistance to a candidate country described in subsection (b) for the purpose of assisting such country to become an eligible country.

(b) **CANDIDATE COUNTRY DESCRIBED**.--A candidate country referred to in subsection (a) is a candidate country that--

(1) satisfies the requirements contained in subparagraphs (A) and (B) of section 606(a)(1); and

(2) demonstrates a significant commitment to meet the requirements of section 607(b) but fails to meet such requirements (including by reason of the absence or unreliability of data).

(c) **ADMINISTRATION**.--Assistance under this section may be provided through the United States Agency for International Development.

(d) **FUNDING**.--Not more than 10 percent of the amount appropriated pursuant to the authorization of appropriations under section 619(a) for fiscal year 2004 is authorized to be made available to carry out this section.

### SEC. 617. GENERAL PERSONNEL AUTHORITIES.

(a) **DETAIL OF PERSONNEL**.--Upon request of the Chief Executive Officer, the head of an agency may detail any employee of such agency to the Corporation on a reimbursable basis. Any employee so detailed remains, for the purpose of preserving such employee's allowances, privileges, rights, seniority, and other benefits, an employee of the agency from which detailed.

(b) **REEMPLOYMENT RIGHTS**.--

(1) **IN GENERAL**.--An employee of an agency who is serving under a career or career conditional appointment (or the equivalent), and who, with the consent of the head of such agency, transfers to the Corporation, is entitled to be reemployed in such employee's former position or a position of like seniority, status, and pay in such agency, if such employee--

(A) is separated from the Corporation for any reason, other than misconduct, neglect of duty, or malfeasance; and

(B) applies for reemployment not later than 90 days after the date of separation from the Corporation.

(2) **SPECIFIC RIGHTS**.--An employee who satisfies paragraph (1) is entitled to be reemployed (in accordance with such paragraph) within 30 days after applying for reemployment and, on reemployment, is entitled to at least the rate of basic pay to which such employee would have been entitled had such employee never transferred.

(c) **HIRING AUTHORITY**.--Of persons employed by the Corporation, not to exceed 30 persons may be appointed, compensated, or removed without regard to the civil service laws and regulations.

(d) **BASIC PAY**.--The Chief Executive Officer may fix the rate of basic pay of employees of the Corporation without regard to the provisions of chapter 51 of title 5, United States Code (relating to the classification of positions), subchapter III of chapter 53 of such title (relating to General Schedule pay rates), except that no employee of the Corporation may receive a rate of basic pay that exceeds the rate for level II of the Executive Schedule under section 5313 of such title.

(e) **DEFINITIONS**.--In this section--

(1) the term ``agency'' means an Executive agency, as defined by section 105 of title 5, United States Code; and

(2) the term ``detail'' means the assignment or loan of an employee, without a change of position, from the agency by which such employee is employed to the Corporation.

## SEC. 618. PERSONNEL OUTSIDE THE UNITED STATES.

(a) **ASSIGNMENT TO UNITED STATES EMBASSIES** .--An employee of the Corporation, including an individual detailed to or contracted by the Corporation, may be assigned to a United States diplomatic mission or consular post or a United States Agency for International Development field mission.

(b) **PRIVILEGES AND IMMUNITIES** .--The Secretary of State shall seek to ensure that an employee of the Corporation, including an individual detailed to or contracted by the Corporation, and the members of the family of such employee, while the employee is performing duties in any country or place outside the United States, enjoy the privileges and immunities that are enjoyed by a member of the Foreign Service, or the family of a member of the Foreign Service, as appropriate, of comparable rank and salary of such employee, if such employee or a member of the family of such employee is not a national of or permanently resident in such country or place.

(c) **RESPONSIBILITY OF CHIEF OF MISSION**.--An employee of the Corporation, including an individual detailed to or contracted by the Corporation, and a member of the family of such employee, shall be subject to section 207 of the Foreign Service Act of 1980 (22 U.S.C. 3927) in the same manner as United States Government employees while the employee is performing duties in any country or place outside the United States if such employee or member of the family of such employee is not a national of or permanently resident in such country or place.

## SEC. 619. AUTHORIZATION OF APPROPRIATIONS.

(a) **AUTHORIZATION OF APPROPRIATIONS**.--There are authorized to be appropriated to carry out this title such sums as may be necessary for each of the fiscal years 2004 and 2005.

(b) **ALLOCATION OF FUNDS**.--

(1) **IN GENERAL**.--The Corporation may allocate or transfer to any agency of the United States Government any of the funds available for carrying out this title. Such funds shall be available for obligation and expenditure for the purposes for which the funds were authorized, in accordance with authority granted in this title or under authority governing the activities of the United States Government agency to which such funds are allocated or transferred.

(2) **NOTIFICATION**.--The Corporation shall notify the appropriate congressional committees not less than 15 days prior to an allocation or transfer of funds pursuant to paragraph (1).



# Millennium Challenge Corporation
### Reducing Poverty Through Growth

## The Millennium Challenge Account

Home
**About Us**
Overview
Board of Directors
Senior Officials
FAQs
Key Documents
Congressional Reports
Sunshine Act Notices

**Countries**
Rankings
Selection
Candidate
Threshold
Eligible

**Compacts**
Program
Procurements

**Guidance**

**Public Affairs**
Events
Press Releases
Fact Sheets
Speeches & Testimony

**Opportunities**
Consultants
Employment
Internships
MCC Procurement

**Contact Us**

In March 2002 in Monterrey, Mexico, President Bush called for a "new compact for glo development," which links greater contributions from developed nations to greater re developing nations. The President proposed a concrete mechanism to implement this Millennium Challenge Account (MCA) - in which development assistance would be pro countries that rule justly, invest in their people, and encourage economic freedom. W bipartisan support, the Millennium Challenge Corporation (MCC) was established on Ja to administer the MCA. Congress provided nearly $1 billion in initial funding for FY04 for FY05. The President has requested $3 billion for FY06 and pledged to increase ann the MCA to $5 billion in the future.

The MCA draws on lessons learned about development over the past 50 years:

1. Aid is most effective when it reinforces sound political, economic and social pol key to encouraging the inflows of private capital and increased trade - the real economic growth;

2. Development plans supported by a broad range of stakeholders, and for which primary responsibility, engender country ownership and are more likely to succ

3. Integrating monitoring and evaluation into the design of activities boosts effect accountability, and the transparency with which taxpayer resources are used.

## Key MCA Principles

▸ Reduce Poverty through Economic Growth: The MCC will focus specifically on p sustainable economic growth that reduces poverty through investments in area agriculture, education, private sector development, and capacity building.

▸ Reward Good Policy: Using objective indicators, countries will be selected to re based on their performance in governing justly, investing in their citizens, and economic freedom.

▸ Operate as Partners: Working closely with the MCC, countries that receive MCA be responsible for identifying the greatest barriers to their own development, e society participation, and developing an MCA program. MCA participation will re level commitment from the host government. Each MCA country will enter into Compact with the MCC that includes a multi-year plan for achieving developme and identifies the responsibilities of each partner in achieving those objectives.

▸ Focus on Results: MCA assistance will go to those countries that have develope well-designed programs with clear objectives, benchmarks to measure progres ensure fiscal accountability for the use of MCA assistance, and a plan for effect and objective evaluation of results. Programs will be designed to enable sustai even after the funding under the MCA Compact has ended.

## Administration

The MCA is administered by the MCC, a new government corporation designed to sup strategies and to ensure accountability for measurable results.



GOVERNMENT EXHIBIT
CARROLL 800-788-0399
B

‣ The MCC is managed by a Chief Executive Officer appointed by the President a the Senate and overseen by a Board of Directors composed of the Secretary of Secretary of Treasury, the U.S. Trade Representative, the Administrator of US/ the MCC and four public members, appointed by the President with the advice the Senate. The Secretary of State is the Chair of the Board and the Secretary the Vice Chair.

‣ The Corporation is designed to make maximum use of flexible authorities to op in contracting, program implementation, and personnel.

Millennium Challenge Corporation
Reducing Poverty Through Growth

. The Millennium Challenge Account

---

In March 2002 in Monterrey, Mexico, President Bush called for a "new compact for global development," which links greater contributions from developed nations to greater responsibility from developing nations. The President proposed a concrete mechanism to implement this compact -- the Millennium Challenge Account (MCA) - in which development assistance would be provided to those countries that rule justly, invest in their people, and encourage economic freedom. With strong bipartisan support, the Millennium Challenge Corporation (MCC) was established on January 23, 2004 to administer the MCA. Congress provided nearly $1 billion in initial funding for FY04 and $1.5 billion for FY05. The President has requested $3 billion for FY06 and pledged to increase annual funding for the MCA to $5 billion in the future.

The MCA draws on lessons learned about development over the past 50 years:

- . Aid is most effective when it reinforces sound political, economic and social policies - which are key to encouraging the inflows of private capital and increased trade - the real engines of economic growth;

- . Development plans supported by a broad range of stakeholders, and for which countries have primary responsibility, engender country ownership and are more likely to succeed;

- . Integrating monitoring and evaluation into the design of activities boosts effectiveness, accountability, and the transparency with which taxpayer resources are used.

Key MCA Principles

Reduce Poverty through Economic Growth: The MCC will focus specifically on promoting sustainable economic growth that reduces poverty through investments in areas such as agriculture, education, private sector development, and capacity building.

Reward Good Policy: Using objective indicators, countries will be selected to receive assistance based on their performance in governing justly, investing in their citizens, and encouraging economic freedom.

Operate as Partners: Working closely with the MCC, countries that receive MCA assistance will be responsible for identifying the greatest barriers to their own development, ensuring civil society participation, and developing an MCA program. MCA participation will require a high-level commitment from the host government. Each MCA country will enter into a public Compact with the MCC that includes a multi-year plan for achieving development objectives and identifies the responsibilities of each partner in achieving those objectives.

Focus on Results: MCA assistance will go to those countries that have developed

well-designed programs with clear objectives, benchmarks to measure progress, procedures to ensure fiscal accountability for the use of MCA assistance, and a plan for effective monitoring and objective evaluation of results. Programs will be designed to enable sustainable progress even after the funding under the MCA Compact has ended.

## Administration

The MCA is administered by the MCC, a new government corporation designed to support innovative strategies and to ensure accountability for measurable results.

The MCC is managed by a Chief Executive Officer appointed by the President and confirmed by the Senate and overseen by a Board of Directors composed of the Secretary of State, the Secretary of Treasury, the U.S. Trade Representative, the Administrator of USAID, the CEO of the MCC and four public members, appointed by the President with the advice and consent of the Senate. The Secretary of State is the Chair of the Board and the Secretary of Treasury is the Vice Chair.

The Corporation is designed to make maximum use of flexible authorities to optimize efficiency in contracting, program implementation, and personnel.

---

privacy policy - plug-ins - contact us - site map - foia requests - oig hotline

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LEROY COWARD and
DARCELLA COWARD,

    Plaintiffs,

    v.

BETTY FLOREY,

    Defendant/Third-Party Plaintiff,

    v.

CHARLES C. DARBY,

    Third-Party Defendant.

Civil Action No. 02-1345 (CKK)



**FILED** ✓

JUN 3 0 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## MEMORANDUM OPINION
(June _28_, 2003)

## I. INTRODUCTION

Presently before the Court is Third-Party Defendant Darby and United States' Motion to Dismiss [#2]. The first question presented by this motion is whether the United States should be substituted as the proper third-party defendant in an action against a federal employee covered by the Federal Employees' Compensation Act. The second question presented is whether, once the government is substituted, a third-party plaintiff may seek indemnification or contribution from the United States. The Court answers the first question in the affirmative. Because Third-Party Defendant Darby was acting in his official capacity at the time of the alleged incident, the United States is the proper defendant in the present case. The Court answers the second question in the negative. For the purposes of this action, the United States must be treated as a "private


(N)


GOVERNMENT
EXHIBIT
C

//

individual under like circumstances." Interpretation of federal and District of Columbia statute
would subsequently bar a third-party indemnity or contribution action. After reviewing the entire
record before it, the Court shall grant Third-Party Defendant and United States' Motion to
Dismiss. As there is no longer a federal question implicated by this case, the Court shall remand
this matter to the Superior Court for the District of Columbia.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On August 8, 2000, at the intersection of 4th and G Streets SW, Washington, D.C., a
vehicular collision occurred involving an automobile driven by Charles C. Darby and an
automobile driven by Betty Florey. Resp. Third-Party Def.'s Mot. Dismiss (hereinafter "Resp.
Mot. Dismiss") at 1. Darby is an employee of the Smithsonian Institution and was certified by
the United States Attorney's Office as acting within the scope of his employment at the time of
the incident. *Id.* at 2. Leroy Coward was a passenger in Darby's vehicle. *Id.* Defendant/Third-
Party Plaintiff Florey was driving a privately owned and operated vehicle. *Id.*

On February 20, 2001, Darby and Coward filed a negligence action against Florey in the
Superior Court of the District of Columbia, seeking monetary damages for injuries suffered. *See
generally* Darby & Coward Compl. On February 1, 2002, Coward and his wife, Darcella C.
Coward, filed a separate complaint in the Superior Court of the District of Columbia against
Florey, alleging negligence and loss of consortium.[1] *See generally* Coward & Coward Compl. In
response to this second action Florey filed a third-party complaint against Darby, alleging
negligence and seeking indemnification and/or contribution in the event that Coward and his wife

---

[1] While two suits were filed, one by Plaintiffs Darby and Coward and one by Plaintiffs
Coward and Coward, it is the latter suit and the subsequent indemnification action that give rise
to this Motion to Dismiss.

2

recovered damages from Florey. *See generally* Third-Party Compl.

On July 5, 2002, this case was removed by Third-Party Defendant Darby from the Superior

Court of the District of Columbia pursuant to 28 U.S.C. §§ 1441, 1442(a)(1), and 1446. Darby

contends that this Court has original jurisdiction under 28 U.S.C. § 1346(b)(1) (2003) ("[T]he

district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United

States, for money damages . . . caused by the negligent or wrongful act or omission of any

employee of the Government while acting within the scope of his office or employment . . . .").[2]

On July 18, 2002, Third-Party Defendant Darby and the United States filed a motion to dismiss

Third-Party Plaintiff Florey's counterclaim pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6) of

the Federal Rules of Civil Procedure. Mot. Dismiss at 1. Stating that the "United States is the

only appropriate third party defendant in this matter," the Motion and accompanying

Memorandum further claimed that under federal statute, Third-Party Defendant Florey could not

"obtain indemnification or contribution against the United States." Mem. Supp. Def.'s Mot.

Dismiss at 1-2. Third-Party Plaintiff Florey responded on August 23, 2002 that fundamental

fairness dictates that a third party "should not be left without a remedy if, in fact, a joint

tortfeasor . . . caused or contributed in some fashion to [the] accident." Resp. Mot. Dismiss at 3.

---

[2] No party has challenged the removal. The Court observes that the authorities are split on whether Third-Party Defendants are entitled to remove in the first instance. Indeed, one prominent commentator has held that such removal is inappropriate. 16 James Wm. Moore et al., *Moore's Federal Practice* § 107.11[1][b][iv] (3d ed. 2003) ("The better view, consistent with the principle that removal jurisdiction is to be strictly construed, is that third-party claims are not removable, because only a party defending against claims asserted by a plaintiff ought to be able to remove. If the original defendant had no right to remove, or chose not to, an ancillary defendant should not be permitted to remove, absent express statutory authority?"). However, since no party challenged the removal and because the Court in granting Third-Party Defendant Darby's Motion remands the case to Superior Court, the Court has decided not to explicitly question removal in this case.

## III. LEGAL STANDARD USED TO EVALUATE MOTIONS TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)

In the present matter, Third-Party Defendant Darby and the government have moved to dismiss on grounds of subject matter and personal jurisdiction as well as failure to state a claim pursuant to 12(b)(6). The proper ground for dismissal where a third-party action for contribution or indemnity is not recognized is lack of subject matter jurisdiction. *See Eagle-Picher Indus., Inc. v. United States*, 937 F.2d 625, 640 (D.C. Cir. 1991) (holding that where common law did not recognize a third-party action for contribution or indemnity, "a federal court does not have [subject-matter] jurisdiction over such an action"). If the terms and conditions under which the United States may be sued are not met, "courts lack jurisdiction to entertain tort claims against it." *GAF Corp. v. United States*, 818 F.2d 901, 904 (D.C. Cir. 1987).

Before any federal court may hear a case, it must ascertain that it has jurisdiction over the underlying subject matter of the action. *See Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986) ("Federal courts ... have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto."). Motions to dismiss for lack of jurisdiction over subject matter are pursuant to Federal Rule of Civil Procedure 12(b)(1). In the Rule 12(b)(1) context, the plaintiff bears the burden of proving jurisdiction. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 182-83 (1936). The standard of review for a motion to dismiss for lack of subject matter jurisdiction is nearly identical to the standard for 12(b)(6) motions with the exception that when a question of jurisdiction is raised, the court may rely on materials outside of the pleadings. *See Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947). When an attack questions the pleadings themselves, the Court must accept all of the Third-Party

4

Complaint's well-pleaded factual allegations as true and draw all reasonable inferences from

those allegations in Third-Party Plaintiff's favor. *United Transp. Union v. Gateway Western*

*R.R.*, 78 F.3d 1208, 1210 (7th Cir. 1996) (citing *Rueth v. EPA*, 13 F.3d 227, 229 (7th Cir. 1993)).

In the present case, to determine whether there is a federal question and subject matter

jurisdiction, the court must determine "whether the complaint purports to state a claim *under*

*federal law*, regardless of the actual validity of the claim." 5 Charles Alan Wright & Arthur R.

Miller, *Federal Practice and Procedure*, § 1350(8) (2d ed. 1990) (emphasis added).

## IV.  DISCUSSION

### A.  The United States Must Replace Third-Party Defendant Darby as the Proper Defendant in Third-Party Defendant Florey's Contribution/Indemnification Action.

When a federal employee acting within the scope of his or her employment is sued for

negligent activity, the Westfall Act generally dismisses the employee from the action and

substitutes the United States as the proper defendant. 28 U.S.C. § 2679(d)(1) (1988); *see*

*Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 419-20 (1995).  Once the Attorney General or

appropriate designee certifies that a federal defendant was in fact acting in official capacity at the

time of a tortious incident, a subsequent action is deemed an action exclusively against the

United States and falls under the provisions of the Federal Torts Claim Act ("FTCA").

*Lamagno,* 515 U.S. at 419-20.  Any other claim against the employee him or herself is thereafter

barred. 28 U.S.C. § 2679 (b)(1) (1988) ("The remedy against the United States . . . resulting

from the negligent or wrongful act or omission of any employee of the government while acting

within the scope of his office or employment is exclusive of any other civil action.").  Because

Mr. Darby was certified as acting within the scope of his employment by Mark E. Nagle, Chief of

5

the Civil Division of the United States Attorney's Office, the United States is properly

substituted as the exclusive defendant in this matter. *See generally* 28 C.F. R. § 15.3 (regulation

discussing Mr. Nagle's authority to make such a designation).

Florey vaguely argues in a footnote in her Response to Defendant's Motion to Dismiss that

she "does not have all the information to make an argument about whether Mr. Darby was acting

within the scope of his employment, but should not be foreclosed from asking appropriate

questions in discovery." Resp. Mot. Dismiss at 2 n.2. It is true that while an appropriate

designee may certify a federal employee, that certification is subject to court review. *See Stokes*

*v. Cross*, 327 F.3d 1210, 1213 (D.C. Cir. 2003) (citing *Lamagno*, 515 U.S. at 420). The Court of

Appeals for the District of Columbia Circuit has held that federal courts may make an

independent determination as to whether an employee in a FECA case was acting in official

capacity in deciding if substitution is proper. *Id.* at 1214 (quoting *Haddon v. United States*, 68

F.3d 1420, 1423 (D.C. Cir. 1995)). Indeed, if there is a material dispute regarding scope of

employment, the district court is required to resolve such a dispute at an evidentiary hearing

using applicable state law. *Id.* at 1213-14 (quoting *Kimbro v. Velten*, 30 F.3d 1501, 1508 (D.C.

Cir. 1994)).

Nevertheless, the District of Columbia Circuit has been careful to instruct that "[n]ot every

complaint will warrant further inquiry," *Id.* at 1216, and holds that a plaintiff challenging a

scope-of-employment certification carries the burden of presenting "specific facts" to rebut the

certification. *Id.* at 1214 (quoting *Lawson v. United States*, 103 F.3d 59, 60 (8th Cir. 1996)).

More specifically, a plaintiff, the Circuit has held, is "required to plead *sufficient facts* that, if

true, would rebut the certification." *Id.* at 1216 (emphasis added). A district court may dismiss a

6

claim without a hearing if the plaintiff fails to allege any facts that, if true, would prove the defendant was acting outside his or her scope of employment. *Id.*

In the instant case, Florey has not pled any facts, that if true, would rebut Darby's certification. Indeed, Plaintiff's filing is utterly devoid of any discussion that would call Defendant's certification into question. Moreover, Florey has not even suggested what discovery she would seek in calling the certification into question; rather, she has only nebulously indicated that she should not be "foreclosed" from asking related questions in discovery. Resp. Mot. Dismiss at 2 n.2. Importantly, at the end of her opposition papers, Florey indicates that her real dispute is in regards to indemnification, not government substitution or Darby's scope of employment. *Id.* at 4 ("Ms. Florey maintains, if Mr. Darby was in fact acting with the scope of his employment, the United States should be substituted . . . ."). Because Florey's Complaint against Darby and her Opposition to the United States' Motion do not contain any "sufficient factual allegations to warrant discovery on the question of scope of employment," the Court finds Darby's certification appropriate. *Stokes*, 327 F.3d at 1215. Accordingly, Florey's contribution/indemnification action against Defendant Darby must therefore be dismissed and the United States must be substituted as a Defendant in that action. *See Lamagno*, 515 U.S. at 419-20. As the United States has been substituted as a Defendant, Plaintiff's claim for indemnification or contribution against the United States falls under the governance of the FTCA.

**B.  Under FECA and District of Columbia Workers Compensation Law, Third-Party Plaintiff Florey May Not Seek Indemnification or Contribution from the United States.**

Congress enacted the Federal Employees' Compensation Act ("FECA") in 1916 to provide

compensation for medical expenses, lost wages, and vocational rehabilitation to federal

employees injured or killed in the performance of official duties without subsequently hindering

those employees with the requirement of proving negligence on the part of the government. *5*

U.S.C. §§ 8101 *et seq.*; *Weyerhaeuser S.S. Co. v. United States*, 372 U.S. 597, 601 (2000).

FECA was later amended to include an exclusive-liability provision, limiting liability of the

United States for the death or injury of a worker solely to FECA. 5 U.S.C. § 8116(c) (2000); *see*

*United States v. Lorenzetti*, 467 U.S. 167, 169 (1984). According to that provision:

> The liability of the United States or an instrumentality thereof under this subchapter
> . . . is exclusive and instead of all other liability of the United States or the
> instrumentality to the employee, his legal representative, spouse, dependents, next
> of kin, and any other person otherwise entitled to recover damages from the United
> States or the instrumentality because of the injury or death in a direct judicial
> proceeding, in a civil action, or in admiralty, or by an administrative or judicial
> proceeding under a workmen's compensation statute or under a Federal tort liability
> statute.

5 U.S.C. § 8116(c) (2000). In other words, no action can be brought against the United States by

a federal employee, outside of FECA's provisions.

This change was enacted to reflect Congress' intended "quid pro quo" compromise that

employees under FECA should be guaranteed the right to benefits regardless of fault or

negligence, but that they would in turn lose the right to then sue their employers for damages.

*See Lockheed Aircraft Corp. v. United States*, 460 U.S. 190, 194 (1983); *id.* at 193-94 (noting

that FECA's exclusive-liability provision was enacted to protect the government from suits under

statutes waiving sovereign immunity).

However, while FECA is the sole recourse from the government for federal employees

claiming FECA benefits, it does not directly bar a *third-party* indemnity action against the United

8

States. *See Lockheed*, 460 U.S. at 199; *Weyerhaeuser*, 372 U.S. at 601 ("There is no evidence whatever that Congress was concerned with the rights of unrelated third parties . . . ."); *Eagle-Picher*, 937 F.2d at 628. Third parties are not per se bound by FECA's exclusive-liability provision because they are not seen as within the "categories of parties who benefit from the 'quid pro quo' compromise that FECA adopts." *Lockheed*, 460 U.S. at 196; *See Bradshaw v. United States*, 443 F.2d 759, 767 (D.C. Cir. 1971). Instead, the Supreme Court has interpreted FECA's exclusivity restrictions to limit only the rights of employees, their relatives, and others claiming through or on behalf of those employees.

While *Lockheed* asserted that a third-party indemnity claim was not categorically prohibited, it did not analyze the underlying claim itself. *Lockheed*, 460 U.S. at 197 n.8. The right to sue must exist independent of the FECA's allowance of the exercise of that right. *See Bush v. Eagle-Picher Industries, Inc.*, 927 F.2d 445, 450 (9th Cir. 1991) (A "third-party must be able to identify the substantive law that affirmatively grants it the right to proceed against the government before the claim can go forward."). *Id.* As discussed *supra*, in this case, the FTCA provides a waiver of sovereign immunity for third-party claims against the government, including claims for contribution and indemnification.

Turning to the FTCA, the Court observes that when a third party has been required to pay damages to an employee covered by FECA, the FTCA "permits an indemnity action against the United States 'in the same manner and to the same extent' that the action would lie against 'a private individual under like circumstances.'" *Lockheed*, 460 U.S. at 198 (citing 28 U.S.C. § 2674); *See GAF Corp.*, 818 F.2d at 904 (holding that the government is liable "to the same extent as a private party for certain torts of its employees committed within the scope of their

employment"). This test has been referred to as the "analogous-liability standard." *See Eagle-Picher*, 937 F.2d at 640. To make the determination of whether a suit against a nongovernmental employer would be precluded, it is necessary to draw a parallel to the "underlying substantive law" of the state where the tort occurred. *See id.* at 634-37. In other words, the Court must assess whether a private District of Columbia employer could be held liable to Florey. If District of Columbia law does not provide for such contribution or indemnification, then no cause of action exists against the United States.

Other jurisdictions have followed this same line of analysis. In *Insurance Co. of North America v. United States* the court first analyzed whether a "fictional private individual would be subject to suit under state substantive law" to determine whether or not the federal government could be liable for contribution or indemnity pursuant to the FTCA. *Ins. Co. N. Am. v. United States*, 643 F. Supp. 465, 466 (M.D. Ga. 1986). The court in *Nicholson v. United Technologies Corp.* analogized state law to find that the exclusivity provision in Connecticut workers' compensation law precluded third-party claims for indemnity. *See Nicholson v. United Tech. Corp.*, 697 F. Supp. 598, 606 (D. Conn. 1988). It asserted that "[t]he term 'under like circumstances' as found in 28 U.S.C. § 2674 has been construed to support an analogy between the United States' compliance with FECA and a private employer's compliance with state compensation law." *Id.*

Because the accident in question occurred in the District of Columbia, Resp. Def.'s Mot. Dismiss at 1, the District of Columbia's laws govern. In the District of Columbia, the relationship between an employer and a third party is guided by the District of Columbia Workers' Compensation Act, which creates a no-fault recovery scheme for injuries suffered

during employment in the District.  D.C. Code Ann. § 32-1504 (2003) (formerly § 36-304); *Myco v. Super Concrete Co.*, 565 A.2d 293, 295-97 (D.C. 1989).  That Act contains its own exclusivity provision, mandating that an employer's liability under the Statute "*shall be exclusive* and in place of all liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, *and anyone otherwise entitled to recover damages from such employer* at law on account of such injury or death."  D.C. Code Ann. § 32-1504(a) (2003) (emphasis added).

The District of Columbia Court of Appeals analyzed the restrictions set forth in Section 32-1504 and held that the ability of a third party to indemnify a *private* employer "runs head-on" with the District's exclusivity provision.  *Myco,* 565 A.2d at 296.  While nothing prevents an employee from seeking damages from a third-party tortfeasor, the District of Columbia Workers Compensation Act categorically bars a third-party indemnity action against a private employer in all but a very few cases,  *id.* at 297, and completely bars an action for contribution, *id.* at 297 n.12.

The present case does not match any of the discrete scenarios where third party indemnification has been permitted by the District of Columbia Court of Appeals.  The *Myco* Court analyzed cases from multiple jurisdictions and found that when a third party's claim against an employer is in conjunction with an express contract, indemnification is generally permitted.  *Id.*  Similarly, the Independent Duty Theory of Indemnity provides that a third party is entitled to indemnity if there exists a "special legal relationship" between the parties apart from the employee's injury.  *Id.* at 299 (citing bailor and bailee or lessor and lessee as examples of this special legal relationship).  However, because there is neither a contractual provision nor a

11

special legal relationship between Florey and the United States in the present case, the Court does
not further analyze these exceptions.

While *Myco* involved a dispute between nongovernmental entities, as stated above, the
government is to be treated, by analogy, as a private party for the purposes of determining
liability. *Lockheed*, 460 U.S. at 198. The *Myco* Court determined that, subject to limited
exceptions, § 32-1504(a) would invalidate a third-party indemnification action against a private
District employer. For that reason, as in the analogous case in *Myco*, D.C. Code § 32-1504
compels the conclusion that here, there is no plausible claim for indemnity against the United
States.

**C.  Because No Federal Claim Remains, This Case Shall Be Remanded to the Superior
Court of the District of Columbia.**

Because Florey may not seek indemnification from the United States, her third-party
Complaint is dismissed against Third-Party Defendant the United States. What remains is
Coward and Coward's suit against Florey brought pursuant to District of Columbia tort law. The
Court lacks subject matter jurisdiction over this Complaint. Coward and Coward's Complaint
does not state a cause of action under federal law. *See* 28 U.S.C. § 1331. Moreover, the Court
does not have subject matter jurisdiction based on diversity of citizenship of the parties before
the Court. 28 U.S.C. § 1332. When a district court did not properly have subject matter
jurisdiction over a case previously removed, the case is remanded to the state court from which it
came. 28 U.S.C. 1447(c) (2003) ("If at any time before final judgment it appears that the district
court lacks subject matter jurisdiction, the case shall be remanded."); *See Ruhrgas AG v.
Marathon Oil Co.*, 526 U.S. 574, 583-84 (1999); *Venez. v. Philip Morris, Inc.*, 287 F.3d 192, 196

12

(D.C. Cir. 2002).  Accordingly, this case shall be remanded to the Superior Court of the District of Columbia.

## V. CONCLUSION

Because the United States is the proper third-party defendant, and because the United States cannot be indemnified based on the FTCA and the exclusivity provision of District of Columbia workers' compensation law, Third Party Defendant's Motion to Dismiss is granted and the case is remanded forthwith to the Superior Court for the District of Columbia. An Order accompanies this Memorandum Opinion.[3]

_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

---

[3] Because the Court remands this case, it denies as moot Darby's Motion to Schedule a Status Conference filed by his separate counsel.

14

Copy to:

Cyrus S. Picken
Suite 204
DAVID HENDRICKS & ASSOCIATES
4200 Parliament Place
Lanham, MD 20706

Beverly M. Russell
Room 10-832
U.S. ATTORNEY'S OFFICE
Judiciary Center Building
555 Fourth Street, NW
Washington, DC 20001

Adrian Ricci
Paul Shiffman
SHIFFMAN & RICCI, P.C.
1700 Pennsylvania Ave., NW., #560
Washington, D.C. 20006